# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| KINSETH HOSPITALITY COMPANY, INC., *an Iowa corporation*, | ) ) ) ) | No.: 20-CV-1363 (DSD/ECW) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| AL QAMRA (MN), LLC, *a Delaware limited liability company*, AL QAMRA US HOLDINGS, LP, *a Delaware limited partnership*, RAYAN PARTNERS, LLC, *a Delaware limited liability company*, and SHERIF MOSTAFA SAAD, *a Minnesota resident*, | ) ) ) ) ) ) ) ) | **AMENDED COMPLAINT**<br><br>**AND ANSWER TO COUNTERCLAIM** |
| Defendants. | ) ) ) | |

Plaintiff Kinseth Hospitality Company, Inc. ("KHC") states and alleges as follows:

## NATURE OF SUIT

1.     This is an action for breach of contract (or, in the alternative, unjust enrichment, promissory estoppel, and accounts stated), fraud, and accounting and constructive trust related to unpaid invoices for hotel costs, expenses, and fees.

2.     KHC performed management services and operated the Sheraton Minneapolis Midtown Hotel at 2901 Chicago Avenue, Minneapolis, Minnesota ("Hotel") for over 4 years. Defendants sold the Hotel to Jay Patel in February 2020, and Defendants stopped paying KHC, vanished with the sale proceeds, and stopped paying KHC the amounts that were due and owing to KHC.

3.      Pursuant to contracts with KHC, receipt and acknowledgement of invoices from KHC, and their assurances and representations to KHC, Defendants owe KHC over $266,000 for monies that KHC advanced to pay the Hotel's costs, expenses, and fees.

4.      Defendants have also failed to pay other contractors of the Hotel in the amount of an additional $335,000. Defendants are also responsible for these amounts.

5.      KHC primarily seeks a money judgment in its favor in the amount Defendants owe KHC, including interest, fees, and costs. KHC also seeks accounting and the imposition of a constructive trust to prevent Defendants from moving money overseas.

### JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over all causes of action asserted herein under 28 U.S.C. § 1332. There is complete diversity of citizenship, and the amount in controversy exceeds $75,000.

7.      This Court has personal jurisdiction over Defendants, who are either residents of the State of Minnesota or conducted significant business operations in Minnesota through their ownership, control, and oversight of the Hotel, which is located in Minneapolis.

8.      This Court is a proper venue under 28 U.S.C. § 1391(b)(1)-(2). At least one defendant resides in the District of Minnesota, and the events and omissions giving rise to the claims herein occurred in the District of Minnesota.

## THE PARTIES

9.      KHC is an Iowa corporation with a principal place of business in North Liberty, Iowa. KHC provides premier management services to over 70 hotel properties across the country. From November 1, 2015 to April 15, 2020, KHC managed the Hotel.

10.     Defendant Al Qamra (MN), LLC ("AQ") is a Delaware limited liability company with a principal place of business in Minneapolis, Minnesota. AQ previously owned the Hotel. On information and belief, AQ's sole member is Defendant Al Qamra US Holdings, LP.

11.     Defendant Al Qamra US Holdings, LP ("AQH") is a Delaware limited partnership and operates primarily in Minneapolis, Minnesota. AQH has two partners: a limited partner and a general partner. The limited partner is believed to be Pacific Shelf 1824 Ltd. ("Pacific Shelf"), a United Kingdom private limited holding company.

12.     Defendant Rayan Partners, LLC ("Rayan"), a Delaware limited liability company, is believed to be the general partner of AQH. As such, under Delaware Code title 6, § 17-403(b), Rayan is responsible for AQH's liabilities and debts. On information and belief, Rayan's members are residents of Delaware and/or foreign states.

13.     Defendant Sherif Mostafa Saad ("Dr. Saad") is a resident of Minnesota, with a domicile at 9829 Frederick Place, Eden Prairie, Minnesota, 44347. Dr. Saad is the Chief Executive Officer and Authorized Person of both AQ and AQH (collectively, "AQ-US"). Dr. Saad was the primary contact and point person for KHC.

14.     On information and belief, AQ and AQH are alter egos of each other, and are the same entity, such that AQ is a mere façade for AQH, and their corporate separateness

must be disregarded. AQH is AQ's sole member. AQH is believed to be the sole funder of AQ's investments in the Hotel. On information and belief, AQ and AQH commingle funds and share bank accounts. AQ and AQH have the same employees; as stated, Dr. Saad is CEO and Authorized Person for both entities. On information and belief, Dr. Saad does not observe separate corporate records and formalities for each entity, and instead acted for them as if they are one entity. Indeed, as explained below, Dr. Saad extended the Management Agreement with KHC on behalf of both entities. On information and belief, AQ is disregarded by AQH for tax and related purposes. On information and belief, AQ is not adequately capitalized by AQH to provide for its liabilities, as demonstrated by its failures to pay and historical need for infusion of funds from AQH and affiliates. On information and belief, AQH has siphoned the proceeds from AQ's sale of the Hotel. AQH has always exerted complete domination and control over AQ, such that AQ has no legal or independent significance of its own. And as explained herein, fraud and injustice would result if corporate forms were not disregarded.

15.     For all intents and purposes, AQ and AQH are alter egos and the same entity, AQ-US, for US-based investments and holdings, such as the Hotel in Minnesota.

16.     Pacific Shelf, owner of AQ-US, is believed to be owned entirely by Al Qamra Holding, a Qatar holding company ("AQ-Qatar"), whose chairman is Hamad Saleh Al Qamra, and whose managing director is Dr. Hossam Eldin Mostafa ("Dr. Mostafa").

17.     Both Pacific Shelf and AQ-Qatar are ultimately controlled by Hamad Saleh H A Al-Nabit, who is believed to be the Minister of Development Planning and Statistics—a Cabinet-level position—for the Emir and Government of Qatar.

18.    This chart summarizes the above-stated relationships:



**FACTUAL BACKGROUND**

**AQ-US Engaged KHC to Manage the Hotel**

19.    On November 1, 2015, KHC entered into an agreement with Midtown Exchange Hotel, LLC, then-owner of the Hotel, to provide expertise in the management and operation of the Hotel's facilities ("Management Agreement"). A copy of the Management Agreement is attached hereto as Exhibit A. At that point, KHC began managing and operating the Hotel.

20.    On November 16, 2016, AQ-US became party to a Management Agreement with KHC when AQ-US purchased the Hotel from Midtown Exchange Hotel, LLC and assumed responsibilities as "Owner" under the Management Agreement. A copy of the

Assignment and Assumption of Management Agreement is attached hereto as <u>Exhibit B</u>. Dr. Saad signed this agreement on behalf of AQ-US.

21.     At the time AQ-US entered into the Assignment and Assumption of Management Agreement, AQ was a Delaware corporation by the name of "Al Qamra (MN) Inc." In 2018, AQ was converted to a Delaware limited liability company, in its current name and form.

22.     AQ-US entered into the Assignment and Assumption of Management Agreement because AQ-US desired to retain KHC as manager and operator of the Hotel.

### AQ-US Agreed to Pay KHC Fees, and to Pay for All Hotel Costs and Expenses

23.     Pursuant to the Assignment and Assumption of Management Agreement, AQ-US agreed to pay KHC monthly management and accounting fees. (Exhibit A, § 1.2.)

24.     Pursuant to the Assignment and Assumption of Management Agreement, AQ-US also agreed to pay for all costs and expenses of maintaining and operating the Hotel, which KHC had the authority to incur on AQ-US's behalf. For example, under the Management Agreement, AQ-US granted KHC "full power, authority, discretion and control in all matters relating to the operation, management, and maintenance" of the Hotel. (*Id.*, § 7.1.) AQ-US also granted KHC the power to enter into leases and service contracts, make purchases on behalf of the Hotel and AQ-US, and procure insurance. (*See id.*, §§ 7.6-7.8, 10.1.) AQ-US further granted KHC the power to hire employees for the Hotel and pay their salaries and benefits. (*See id.* §§ 16.1-16.3.) The Management Agreement provided

that costs and expenses of maintaining and operating the Hotel were to be paid from revenues generated by the Hotel and the Owner. (*Id.*, § 2.1.)

25.   If there were insufficient funds in the Hotel's bank accounts to pay all costs and expenses, AQ-US was required to immediately advance additional funds to enable KHC to make payment for the amounts due. (*See id.*) During the 4+ years KHC managed and operated the Hotel, AQ-US and/or its other affiliates placed funds in these accounts.

26.   If AQ-US did not, or could not, advance the necessary funds to cover all costs and expenses, KHC was itself empowered to advance funds as necessary to pay for those costs and expenses, as well as the fees that AQ-US owed KHC, in order to make sure that the Hotel remained operational and a desirable hospitality destination. (*Id.*, § 9.1.)

27.   In the event KHC advanced funds on AQ-US's behalf to cover costs, expenses, and KHC's fees, AQ-US agreed to "immediately" repay those funds, "together with interest at the rate of ten percent (10%) per annum." (*Id.*, § 9.1.)

28.   The Management Agreement's original Term was for 3 years, from November 1, 2015 to November 1, 2018. (*See id.*, § 1.1.) However, the Term would automatically renew for successive 1-year periods unless either party elected not to renew the Management Agreement through written notice. (*Id.*)

29.   As the end of the original 3-year Term approached, AQ-US agreed to extend the Management Agreement to December 31, 2018 by letter dated September 19, 2018, a copy of which is attached hereto as Exhibit C.

30.   Dr. Saad signed the extension letter on behalf of AQ *and* "its sole member" (Exhibit C at 2), which was identified at the time to be "Al Qamra (US) Inc.," a Delaware

corporation that is the predecessor to AQH. Thus, AQ-US, collectively, adopted and extended the Management Agreement with KHC.

31.     In fall 2018, AQ-US investigated options for future management and operation of the Hotel.

32.     After evaluating its options, Dr. Saad, acting as CEO and Authorized Person for both AQ and AQH (AQ-US), decided to continue to retain KHC to manage and operate the Hotel going forward, pursuant to the terms of the Management Agreement. KHC agreed to this arrangement and the further extension and renewal of its Term.

33.     As such, AQ-US agreed to extend and renew the Management Agreement for consecutive Terms into the future. This was consistent with the Management Agreement, which provided the Management Agreement would automatically renew for successive periods unless either party elected not to renew. (*See* Exhibit A, § 1.1.)

34.     KHC continued to manage and operate the Hotel in accordance with the Management Agreement for the full calendar year 2019, and then into 2020. KHC provided these services in reliance on the parties' arrangement to extend and renew the Term of the Management Agreement to include these time periods.

**AQ-US Sold the Hotel to Patel in Spring 2020,
but Failed to Pay Outstanding Costs, Expenses, and Fees**

35.     In January, February, March, and April 2020, the revenue from the Hotel's operation was not sufficient to pay for the Hotel's costs, expenses, and fees. Under the Management Agreement, AQ-US is responsible for this shortfall.

36.     During this time frame, and since then, KHC provided AQ-US with invoices and copies of accounts payable on multiple occasions, requesting AQ-US make payments. AQ-US has acknowledged these statements of accounts, and has never objected to them.

37.     In early 2020, AQ-US finalized a sale of the Hotel to Patel. On information and belief, the sale took place February 4, 2020.

38.     After the sale, AQ-US leased the Hotel from Patel and continued to retain KHC to manage and operate the Hotel until April 15, 2020. At the end of this period, KHC assisted in de-branding the then-Sheraton Hotel. Patel took over management and operation of the Hotel on April 15, 2020.

39.     AQ-US, through Dr. Saad, assured KHC and other contractors that AQ-US and its affiliates would honor its contractual obligations and pay all costs, expenses, and fees owed at the time of sale, and during the lease period. AQ-US intimated that proceeds from the sale would cover these items. Despite these assurances, payments were not made.

40.     Also during this February-April period, the COVID-19/coronavirus pandemic took hold. KHC desired to close the Hotel or reduce operations, but AQ-US insisted the Hotel remain open. KHC complied with AQ-US's instructions.

41.     KHC repeatedly contacted AQ-US and Dr. Saad during January, February, March, and April, and notified them of the need for AQ-US to immediately advance additional funds to increase the balances of the Hotel's bank accounts.

42.     KHC provided AQ-US with invoices and statements for the costs, expenses, and fees, all of which continue to be outstanding and unpaid. KHC provided AQ-US documentation as new invoices for costs, expenses, and fees became due, and provided

regular updates to these statements of accounts. Statements were provided to AQ-US on several occasions throughout January, February, March, April, and May 2020.

43.     AQ-US and its affiliates have had possession of this documentation—in some cases for several months—and have never objected the propriety of the costs, expenses, or fees or amounts therefor.

44.     Rather, on behalf of AQ-US, Dr. Saad repeatedly assured KHC, through phone calls and email correspondence on multiple occasions and on a weekly basis, that, consistent with AQ-US's contractual obligations, funds would be transferred from AQ-US and its affiliates to cover the costs and expenses.

45.     For example, in late March/early April, KHC informed AQ-US and Dr. Saad of revenue shortfalls and cited particular concerns related to paying security contractors. In acknowledgement of AQ-US's contractual obligations, Dr. Saad assured KHC that AQ-US and its affiliates would make payments. In fact, AQ-US paid the security company directly, but AQ-US and its affiliates did not pay for the other outstanding costs, expenses, and fees. On information and belief, the funds AQ-US used to pay the security company came from accounts held by AQH, Private Shelf, AQ-Qatar, and/or other affiliates.

46.     Dr. Saad has also included Dr. Mostafa in his assurances that funds will be provided to cover all costs and expenses. In early May 2020, Dr. Mostafa stated, in response to Dr. Saad's request that he provide information to KHC, that AQ-US and its affiliates (such as AQ-Qatar) would be closing accounts and wiring funds.

47.     In reliance on Dr. Saad's and Dr. Mostafa's repeated assurances, as well as assurances relayed through AQ-US's attorney during the same March-May 2020 time

frame, KHC agreed to advance its own funds to pay for some of the outstanding bills, such as those for insurance, payroll, certain shared and miscellaneous services, and KHC's own management and accounting fees.

48.     Despite Dr. Saad's and Dr. Mostafa's assurances and representations, AQ-US and its affiliates have still not repaid KHC. The amount that AQ-US must pay KHC under the Management Agreement exceeds $266,000.

49.     KHC has declined to advance additional funds for AQ-US's benefit given AQ-US's failures to repay amounts already advanced. In addition to the amounts owed KHC, AQ-US currently owes other contractors more than $335,000.

50.     Because KHC, pursuant to its responsibilities under the Management Agreement, arranged for the services and goods provided by these other contractors, these contractors may eventually seek payment from KHC in lieu of AQ-US or its affiliates. Some contractors have already requested payment from KHC.

51.     KHC has repeatedly demanded payment of the amounts owed to it and other contractors by AQ-US pursuant to the Management Agreement, but Defendants have failed to pay or arrange for the payment of the amounts owed.

52.     On information and belief, Defendants' failures to repay KHC are intentional. AQ-US sold the Hotel property in February 2020 for $8,050,000. This is more than enough cash to cover the amounts owed KHC and other contractors.

53.     On information and belief, AQ-US has intentionally absconded with the proceeds from the sale of the Hotel by distributing those proceeds to affiliates, such as

Pacific Shelf, Rayan, AQ-Qatar, and others, so as to avoid honoring AQ-US's obligations to KHC and other contractors.

## COUNT I: BREACH OF CONTRACT

### Against AQ and AQH (AQ-US) and Rayan

54.     KHC repeats all foregoing allegations and realleges them herein.

55.     AQ and AQH (AQ-US) entered into the Management Agreement with KHC, forming a legally-binding and enforceable contract under Minnesota law.

56.     Originally, AQ-US entered into the Management Agreement in 2016 by assuming the obligations of Midtown Exchange Hotel, LLC. (*See* Exhibits A & B.)

57.     Through Dr. Saad, CEO and Authorized Person, AQ-US extended the Management Agreement in September 2018. (*See* Exhibit C.)

58.     Through Dr. Saad, AQ-US extended and renewed the Management Agreement again in 2019. The parties acted in accordance with this extension and renewal through 2019 and until April 15, 2020.

59.     AQ-US retained KHC pursuant to the terms of the Management Agreement, and AQ-US required KHC to act consistent with the terms of the Management Agreement during this period.

60.     Under the Management Agreement as extended, AQ-US is obligated to repay KHC for the over $263,000 in funds it has advanced to cover the costs and expenses of the Hotel, along with KHC's management and accounting fees.

61.     AQ-US, despite proper, timely, and repeated notice and an opportunity to cure, has breached its contract with KHC by failing to immediately repay KHC.

62.     In addition, the Management Agreement provides that AQ-US shall pay "interest at the rate of ten percent (10%) per annum" on the unpaid advances made by KHC. (Exhibit A, § 9.1.) KHC estimates this amount currently exceeds $3,000, and interest on the advanced funds continues to accrue each month.

63.     Furthermore, the Management Agreement provides that, in the event KHC prevails in an action to enforce the Management Agreement, KHC shall be entitled to recover from AQ-US "all costs and expenses incurred in such proceedings, including reasonable attorney fees and disbursements." (*Id.*, § 6.1.) KHC seeks the fees and costs it has and will incur in bringing and prevailing in this action.

64.     As a direct and proximate result of AQ-US's breaches of contract, KHC has incurred, and will continue to incur, substantial damages, costs and expenses in an amount in excess of $266,000 plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

65.     As general partner of AQH, Rayan is responsible for AQH's liability under this count. *See* Del. Code tit. 6, § 17-403(b).

## <u>COUNT II: ACCOUNTS STATED</u>

### Against AQ and AQH (AQ-US) and Rayan

66.     KHC repeats all foregoing allegations and realleges them herein.

67.     KHC alleges this claim in the alternative to Count I, if the Court were to determine that there is any impediment to the enforceability of the Maintenance Agreement as extended, as to AQ, AQH, or both entities (or as a single entity).

13

68.     AQ and AQH (AQ-US) had a relationship with KHC, whereby through the parties' history and course of dealing, and based on AQ-US's assurances and representations, AQ-US agreed to reimburse KHC for advancing funds to cover the Hotel's costs and expenses and KHC's management and accounting fees.

69.     KHC provided all statements and records demonstrating the amounts for these costs, expenses, and fees on several occasions throughout January, February, March, April, and May 2020. KHC also provided statements and records demonstrating the amounts advanced by KHC for these costs, expenses, and fees on several occasions in the same time period. KHC provided AQ-US with regular updates to these statements as well. In this, KHC has fully stated the accounts owed by AQ-US.

70.     AQ-US assented to paying the accounts stated by KHC, on multiple occasions. AQ-US intimated that it would use proceeds from the sale of the Hotel to pay all accounts due. Through AQ-US's assurances and representations, it acknowledged the correctness of the accounts stated and that such amounts are owing and due.

71.     In the alternative, through AQ-US's lack of objection after having had months to review these records, AQ-US has impliedly acquiesced and assented to the correctness and validity of the statements.

72.     Furthermore, AQ-US, through its understanding of the prior terms of the Management Agreement under which the parties continued to conduct themselves, assented to the 10% per annum interest to be assessed on the unpaid accounts each month, as well as KHC's costs, expenses, and attorneys' fees in pursuing legal action.

73.     As a direct and proximate result of AQ-US's acquiescence to these accounts stated, KHC has incurred, and will continue to incur, substantial damages, costs and expenses in an amount in excess of $266,000 plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

74.     As general partner of AQH, Rayan is responsible for AQH's liability under this count. *See* Del. Code tit. 6, § 17-403(b).

## COUNT III: UNJUST ENRICHMENT

### Against AQ and AQH (AQ-US) and Rayan

75.     KHC repeats all foregoing allegations and realleges them herein.

76.     KHC alleges this claim in the alternative to Count I, if the Court were to determine that there is any impediment to the enforceability of the Maintenance Agreement as extended, as to AQ, AQH, or both entities (or as a single entity).

77.     AQ and AQH ("AQ-US") have unjustly received the benefit of KHC's advancing of funds to cover the Hotel's costs, expenses, and fees.

78.     AQ-US is not entitled to the benefits it received, which would not have inured to it without KHC's reliance on its assurances, made through Dr. Saad and Dr. Mostafa, that AQ-US and its affiliates would repay KHC for the advanced funds.

79.     The circumstances under which AQ-US received these benefits from KHC make it unjust and inequitable to permit retention of the benefits by AQ-US.

80.     AQ-US's retention of the benefit of the funds advanced by KHC is not legally justifiable given its assurances and representations to KHC, as well as the parties' past history and course of dealing.

81.     AQ-US has been unjustly enriched to the detriment and damage of the KHC in an amount in excess of $266,000, plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

82.     As general partner of AQH, Rayan is responsible for AQH's liability under this count. *See* Del. Code tit. 6, § 17-403(b). Furthermore, Rayan is believed to be in control of AQH's assets. Rayan may also have received distributions from AQH from the proceeds of the sale of the Hotel, which can be used to satisfy AQH's liability to KHC. To the extent such distributions have been made, Rayan has been unjustly enriched.

## COUNT IV: PROMISSORY ESTOPPEL
### Against AQ and AQH (AQ-US) and Rayan

83.     KHC repeats all foregoing allegations and realleges them herein.

84.     KHC alleges this claim in the alternative to Count I, if the Court were to determine that there is any impediment to the enforceability of the Maintenance Agreement as extended, as to AQ, AQH, or both entities (or as a single entity).

85.     AQ and AQH (AQ-US), through Dr. Saad, promised that KHC would be repaid for the amounts KHC advanced to cover the Hotel's costs, expenses, and fees. These promises were made prior to and at the time of the Hotel's sale to Patel in February 2020, and then repeatedly throughout February, March, April, and May 2020.

86.     Along with Dr. Saad, Dr. Mostafa made similar promises, such as that that KHC would be repaid upon completion of review of the costs, expenses, and fees.

87.     KHC reasonably and justifiably relied on the promises made by AQ-US, through Dr. Saad, who was assisted by Dr. Mostafa, when it advanced over $263,000 to cover outstanding costs, expenses, and fees.

88.     KHC also reasonably and justifiably relied on these promises, as well as AQ-US and Dr. Saad's extension of the Management Agreement, such that if KHC advanced funds and was not immediately repaid, KHC would be entitled to interest on this amount, as well as its costs, expenses, and attorneys' fees if it were forced to pursue legal action.

89.     In reliance on these assurances and representations and the extension of the Management Agreement, KHC paid employees who worked at the Hotel, paid other vendors and contractors, and continued to manage and operate the Hotel even after the sale of the Hotel, while AQ-US leased the Hotel from new owner Patel. In reliance on these assurances and representations, KHC assisted with the transition to Patel.

90.     KHC has been damaged by its reliance on AQ-US's assurances and representations, which were false, because KHC months later still has not been paid.

91.     As a direct and proximate result of AQ-US's broken promises, KHC has incurred, and will continue to incur, substantial damages, costs and expenses in an amount in excess of $266,000 plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

92.     As general partner of AQH, Rayan is responsible for AQH's liability under this count. *See* Del. Code tit. 6, § 17-403(b).

## COUNT V: FRAUD

### Against Dr. Saad, AQ and AQH (AQ-US), and Rayan

93.    KHC repeats all foregoing allegations and realleges them herein.

94.    AQ and AQH (AQ-US) and Dr. Saad himself all promised that KHC would be repaid for the amounts KHC advanced to cover the Hotel's costs, expenses, and fees. These promises were made at the time of the Hotel's sale to Patel in February 2020, and then repeatedly during the transition period ending in April 2020.

95.    Along with Dr. Saad, Dr. Mostafa made similar promises at Dr. Saad's request, such as that that KHC would be repaid upon completion of review of the costs, expenses, and fees.

96.    These assurances and representations were false and misleading when made, and AQ-US and Dr. Saad made and facilitated these statements with knowledge of their false and misleading nature when made. In the alternative, these assurances and representations were knowingly reckless when made.

97.    On information and belief, AQ-US and Dr. Saad (along with accomplice Dr. Mostafa) intended to induce the KHC to rely on their assurances and representations. AQ-US and Dr. Saad wanted KHC to continue managing and operating the Hotel, and continue advancing funds to cover costs, expenses, and fees, so that the sale to Patel could be closed to AQ-US's and Dr. Saad's benefit, but to KHC's detriment.

98.    These assurances and representations were material to KHC's decision to advance funds to cover costs, expenses, and fees, and to continue managing and operating the Hotel during the transition and handoff to Patel.

99.   KHC did not know that AQ-US and Dr. Saad were making false and misleading assurances and representations. The truth was only known or ascertainable by AQ-US (and its affiliates) and Dr. Saad at the time, and was kept secret from KHC.

100.   KHC reasonably and justifiably relied on the promises made by AQ-US and Dr. Saad, assisted by Dr. Mostafa, when it advanced over $263,000 to cover outstanding costs, expenses, and fees. KHC's reliance was the direct inducement for KHC's decision to advance funds to cover these costs, expenses, and fees.

101.   In reliance on AQ-US's and Dr. Saad's assurances and representations, KHC paid employees who worked at the Hotel, paid other vendors and contractors, and continued to manage and operate the Hotel even after the sale of the Hotel, while AQ-US leased the Hotel from new owner Patel.

102.   KHC has been damaged by its reliance on AQ-US's and Dr. Saad's representations, which were false, because KHC months later still has not been paid, and has been forced to incur interest, costs, expenses, and attorneys' fees to bring this action.

103.   As a direct and proximate result of AQ-US's and Dr. Saad's fraud and facilitation of fraud, KHC has incurred, and will continue to incur, substantial damages, costs and expenses in an amount in excess of $266,000 plus investigative costs, attorneys' fees, and additional costs and disbursements, the exact amount to be established at trial.

104.   In addition and the alternative, AQH and Dr. Saad have aided and abetted AQ's fraud upon KHC, and on information and belief, AQH and Dr. Saad have received fraudulent transfers from AQ constituting the proceeds of the sale of the Hotel, in an attempt to hinder, delay, and defraud KHC as a creditor of AQ.

105.    As general partner of AQH, Rayan is responsible for AQH's liability under this count. *See* Del. Code tit. 6, § 17-403(b).

## COUNT VI: ACCOUNTING AND CONSTRUCTIVE TRUST

### Against AQ and AQH (AQ-US) and Rayan

106.    KHC repeats all foregoing allegations and realleges them herein.

107.    AQ and AQH (AQ-US), in acting as alleged above, have wrongfully retained funds to the detriment and damage of KHC.

108.    If AQ-US's representations, made through Dr. Saad and Dr. Mostafa, that the companies are winding down in connection with the sale of the Hotel are true, then the funds received from that sale may have been or will be distributed to other parties, including but perhaps not limited to Pacific Shelf, Rayan, AQ-Qatar, and others residing in foreign states.

109.    In order to prevent AQ-US from being unjustly enriched and avoiding payment to KHC and others through their misrepresentations, equity demands the Court enter an order directing AQ-US to account for all funds received from the sale of the Hotel and a judgment imposing a constructive trust in favor of the KHC and other Hotel contractors upon all property and assets of AQ-US.

110.    As general partner of AQH, Rayan is responsible for AQH's liability under this count. *See* Del. Code tit. 6, § 17-403(b). Furthermore, Rayan is believed to be in control of AQH's assets. Rayan may also have received distributions from AQH from the proceeds of the sale of the Hotel, which can be used to satisfy AQH's liability to KHC. To the extent

such distributions have been made, equity demands an accounting and constructive trust on Rayan's assets as well.

## ANSWER TO COUNTERCLAIM
## AND AFFIRMATIVE DEFENSES

1.      To the extent an answer to Defendants' counterclaim set forth in Defendants' Answer dated July 6, 2020 is required at this time despite consent to file this Amended Complaint, KHC denies Defendants' allegations, or lacks sufficient knowledge or information to admit or deny, except that KHC admits the employees of the Hotel formed a union and entered into a collective bargaining agreement with the Hotel, and that the union filed a charge with the National Labor Relations Board ("NLRB") against the Hotel and Jay Patel on June 26, 2020. In its charge, the union did not allege any wrongdoing on the part of KHC. KHC has not violated any obligations to the Hotel union, nor has it violated any state or federal law with respect to union bargaining.

2.      Defendants fail to state a claim upon which relief can be granted.

3.      Defendants lack Article III standing to assert the claim because they have not suffered an injury-in-fact, nor is one imminent or impending, and any potential injury to them resulting from the charge is entirely speculative at this time.

4.      To the extent Defendants were to suffer an injury, that injury may have been caused, in whole or in part, by Defendants' and/or third parties' action and/or inaction.

5.      Defendants' claim is barred or limited by reason of offsets to which KHC is entitled pursuant to its claims against Defendants.

6.      Defendants' claims may be barred or limited for failure to mitigate harm.

7.      Defendants' claim may be barred or limited by a contractual exception or limitation to indemnity.

8.      Defendants fail to join necessary and indispensable parties under Rule 19, such as the parties that are involved in the NLRB proceeding, which may impair or impede those parties' ability to protect their interests and/or leave KHC subject to a substantial risk of incurring inconsistent obligations.

9.      To the extent Defendants' claim rests on equitable principles or seeks equitable relief, it is barred by the doctrine of Defendants' own unclean hands and/or estoppel, and KHC acted at all times in good faith.

10.     KHC reserves the right to assert any and all general and affirmative defenses under Rule 12 as more information related to the charge becomes available.

## **PRAYER FOR RELIEF**

**WHEREFORE**, KHC requests relief from this Court as follows:

A.      A judgment in favor of KHC and against Defendants for all damages incurred by KHC, which exceed $266,000, the exact amount to be established at trial;

B.      Awarding KHC any and all future damages which may arise, such as in the form of interest;

C.      Awarding KHC all costs and disbursements, including costs of investigation and reasonable attorneys' fees incurred in connection with this matter;

D.      Ordering AQ and AQH (AQ-US) and Rayan to account for all funds received from the sale of the Hotel, and imposing a constructive trust upon such assets;

E.      A jury trial on any and all issues and claims so triable; and

F.      An order awarding any further relief deemed equitable and just by this Court.

Date: July 27, 2020.                          **WINTHROP & WEINSTINE, P.A.**

                                              *s/Joseph W. Windler*
                                              Joseph W. Windler (#0387758)
                                              Kyle R. Kroll (#0398433)
                                              225 South Sixth Street, Suite 3500
                                              Minneapolis, MN 55402-4629
                                              T (612) 604-6400 | F (612) 604-6800
                                              jwindler@winthrop.com
                                              kkroll@winthrop.com

                                              *Attorneys for Plaintiff Kinseth*
                                              *Hospitality Company, Inc.*